GEORGE WASHINGTON, The. See Case No. 4,100.

GEORGE WASHINGTON, The (SUAREZ v.). See Case No. 13,585.

---

# Case No. 5,349.

## The GEORGIA.

### [1 Lowell, 96.] [1]

District Court, D. Massachusetts. Sept., 1866.[2]

PRIZE—SALE OF VESSEL IN NEUTRAL PORT.

1. A sale by a belligerent of a war ship to a neutral in a neutral port is invalid by the law of nations as understood both in England and America.

[See note at end of case.]

2. This doctrine applied to the sale of the Georgia in the port of Liverpool in June, 1864, the purchaser having full notice of the char-

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[2] [Affirmed in 7 Wall. (74 U. S.) 32.]

---

acter of the vessel, but buying in good faith and for his own use.

[See note at end of case.]

The Georgia was captured as prize on the high seas by the Niagara, and sent into a port of this district for adjudication. The taking of depositions in Liverpool, and elsewhere, occupied a considerable time. The facts appear in the opinion of the court.

R. H. Dana, Jr., Dist. Atty., for the United States and captors, cited: The Minerva, 6 C. Rob. Adm. 396; 2 Wildm. Int. Law, 90; U. S. v. The Etta [Case No. 15,060]; 3 Phillim. Int. Law, § 486; and, to show the knowledge of the claimant and the notice to the government of Great Britain, Diplomatic Correspondence of the United States, 1863 and 1864, and the claimant's deposition. He contended further that the Georgia was dismantled and sold for the express purpose of avoiding imminent capture.

J. A. Loring, for claimant. The whole doctrine asserted by the captors rests on The Minerva [supra], and that was decided on its own circumstances, the learned judge being of opinion that the bona fides of the sale was not clearly made out.

LOWELL, District Judge. The depositions establish that this is the same vessel that was the subject of diplomatic correspondence between Mr. Adams and Lord Russell in 1863 and 1864, before the sale to the claimant; that she was built on the Clyde, and manned, equipped, and armed, on the coast of France, by men, guns, and arms, taken from Liverpool; that she sailed on a cruise in which she captured and destroyed several American ships, put into a port of France for repairs, and sailed thence to Liverpool, where she arrived May 1, 1864. Her history was well known and was made the subject of a debate in parliament on the twelfth of May. On the second of June the claimant agreed to buy the vessel, but delayed to take title, having some doubt whether a British register would be granted her; but being reassured upon this point by the collector of customs at Liverpool, the sale was completed on the thirteenth of June. On the seventh of June Mr. Adams wrote to Lord Russell, "I must pray your lordship's pardon, if I take the liberty to renew, in this case, the observations which I had the honor to submit in my note of the 14th of March of last year, on the case of the steamer Sumter alias the Gibraltar. On behalf of my government I feel it my duty, in consonance with the practice heretofore adopted by Great Britain, to decline to recognize the validity of the sale of this armed vessel, heretofore carrying on war against the people of the United States, in a neutral port, and to claim the right of seizing it wherever it may be found, on the high seas." Dip. Corresp. 1864, pt. 2, p. 100. The note referred to, is one in which Mr. Adams had

cited from Mr. Phillimore's [3] then recent work on International Law, the statement that the purchase by neutrals of enemies' ships of war was held by British courts to be invalid. Dip. Corresp. 1863, pt. 1, p. 152. In accordance with this notice, given six days before the claimant's title was completed, Mr. Adams sent word to the commander of the Niagara to seize the Georgia, if he could find her on the high seas. This, too, was well known before the ship sailed, as appears by the letters and telegrams in this record. She was seized and sent in accordingly.

I ought at the outset to say that I am entirely satisfied that the sale was genuine and for value, and that any suspicions which were raised by the apparent connection of certain persons with the Georgia, as well after as before the sale, are fully explained; so that the only question of any importance in the case is whether the point of law was well taken by Mr. Adams. Only one case earlier than our war has been found; and the text writers have contented themselves with citing it; The Minerva, 6 C. Rob. Adm. 396, is agreed by them all to have settled the law for Great Britain, that such a sale is invalid. 3 Phillim. Int. Law, 607; 2 Wildm. Int. Law, 90; Twiss, Law of Nations (in time of war), 465. In France the law is said to be that not even merchant ships can be lawfully sold by a belligerent to a neutral after the war has begun: 2 De Pistoye & Duverdy, p. 1, tit. 6, c. 2; Lawr. Wheat. 581, note 182; Heffter (French Ed.) § 166. This stringent doctrine is defended by some writers and attacked by others on grounds of justice and policy, but all agree that it is the law now administered in France. Mr. Lawrence, in the note above cited, says the law of Russia is like that of France. In England merchant ships are put on the same footing as other merchandise, but the sale must be above suspicion. Phillim. ubi supra.

Mr. Phillimore in this part of his treatise adopts the Essay of Judge Story, printed as an appendix to the second volume of Wheaton's Reports, so that we have the authority of both these learned jurists for the doctrine that a sale of a ship of war is illegal. When we find that the law of several continental nations prohibits the sale of all ships, and the law of England, approved by Mr. Justice Story, and by the English and American writers who mention the subject at all, excepts only merchant ships, we may well conclude that this sale was illegal.

But we need not rest here. In August, 1864, Lord Russell notified Mr. Adams that the government had given directions that in future no ship of war, of either belligerent, should be allowed to be brought into any of her majesty's ports for the purpose of be-

ing dismantled and sold. Dip. Corresp. pt. 2, p. 278. This order is carefully worded, as if it were a mere regulation of the right to enter the port for a particular purpose; but it in fact assumes the right to prevent a sale of war-ships when in port; a power which the government would never have usurped if the sale were considered lawful. It is an admission of its illegality. In October, 1864, The Etta, which had been a Confederate cruiser, and had been sold to British merchants in Nassau, and afterwards captured, was condemned by Judge Field, who delivered an able and learned judgment, founded on the case of The Minerva and the other opinions which I have cited. U. S. v. The Etta [Case No. 15,060]. In the argument of the case before me, it was said that the British government had not only acquiesced in this judgment, but had affirmed its justice and propriety in a dispatch from Lord Russell to Lord Lyons or one of her majesty's representatives here. I have not been able to verify the accuracy of this statement, but it was admitted by counsel to be true, and is highly probable, as the doctrine had already been conceded by the dispatch of August, 1864. Considering the part which negotiation necessarily plays in international law, and the great experience and well-known character of the statesman who expressed this opinion, we cannot but attribute to it at least the weight that the civil law gives to the responsa prudentum.

Such being the uniform voice of all the authorities, without a single dissent, it is hardly necessary to examine the reasons on which the doctrine rests. The duty of a neutral is to give no aid to either belligerent. This duty is evaded if ships of war in great danger of capture, as was notoriously the case here, can be turned into money in the neutral port in which they have taken refuge. The standing order which the British government had adopted, limiting the time that such vessels should stay in the ports of the empire, was in fact evaded by the sale of the Georgia, against the protest of our representative, and the very dangers which Lord Stowell apprehended are illustrated by this case.

While, therefore, I cannot but regret that an innocent purchaser should suffer, I must hold the claimant's title to be bad. If Mr. Bates had taken the advice of a lawyer, or of the foreign office, instead of relying on the opinion of the collector of customs of Liverpool, whose communications with the foreign office appear to have been liable to some interruptions during the war, he would have learned that the law of nations, as accepted both in England and the United States, was against the validity of such a transaction, and that the government of his country had been twice distinctly notified of our opinion in the matter. The claimant appears to have relied on some warranty from his own government which the issuing of

---

[3] Now Sir R. Phillimore, judge of the high court of admiralty.

British papers might imply. If so I have no reason to suppose that his reliance is vain. If an official person has made a mistake, no doubt the sufferer will be indemnified by any right-minded government; and that of Great Britain has not been backward in meeting such obligations.

Decree of condemnation.

[NOTE. The decree of condemnation in this case was affirmed by the supreme court, Mr. Justice Nelson delivering the opinion. The rule that the purchase of a ship of war from an enemy, while lying in a neutral port to which it had fled, is invalid, was applied, and the learned justice referred to the proofs as establishing the fact that the claimant had purchased the Georgia without any purpose of permitting her to be again armed and equipped for the Confederate service, and for the purpose, as avowed at the time, of converting her into a merchant vessel. He had, however, full knowledge of her antecedent character, of her armament and equipment as a vessel of war of the Confederate navy, and of her depredations on the commerce of the United States. The vessel had been dismantled, and repairs to fit her for the merchant service made at the cost of some £3,000. It was held that the purchase of such a vessel could not be allowed, since it would enable the enemy to secure himself from the disadvantage into which he has fallen, so far, at least, as to have the value of the vessel restored to him by the neutral purchaser. 7 Wall. (74 U. S.) 32.]